*By order of the Bankruptcy Appellate Panel, the precedential effect of this decision is limited to the case and parties pursuant to 6th Cir. BAP LBR 8013-1(b). See also 6th Cir. BAP LBR 8010-1(c).*

**File Name: 07b0003n.06**

**BANKRUPTCY APPELLATE PANEL OF THE SIXTH CIRCUIT**

| | |
|---|---|
| In re: TROUTMAN ENTERPRISES, INC.,      ) | |
|                      Debtor.    ) | |
| _____ ) | |
| JOHN PAUL RIESER, CHAPTER 7 TRUSTEE ) IN BANKRUPTCY, ) | |
|          Plaintiff - Appellant,    ) | |
| v.    ) | Nos. 05-8051 and 05-8081 |
| DINSMORE & SHOHL, LLP, *et al.*,    ) | |
|          Defendants - Appellees.    ) | |
| _____ ) | |

Appeal from the United States Bankruptcy Court
for the Southern District of Ohio, Eastern Division, at Columbus
Adv. Pro. 04-2029

Argued: November 8, 2006

Decided and Filed: January 26, 2007

Before: PARSONS, SCOTT, and WHIPPLE, Bankruptcy Appellate Panel Judges.

_____

**COUNSEL**

**ARGUED:** John Paul Rieser, RIESER & MARX, Dayton, Ohio, for Appellant. Robert J. Sidman, VORYS, SATER, SEYMOUR & PEASE, Columbus, Ohio, for Appellees. **ON BRIEF:** John Paul Rieser, Patricia J. Friesinger, RIESER & MARX, Dayton, Ohio, for Appellant. Robert J. Sidman, Tiffany Strelow Cobb, VORYS, SATER, SEYMOUR & PEASE, Columbus, Ohio, for Appellees.

---

**OPINION**

---

MARCIA PHILLIPS PARSONS, Bankruptcy Appellate Panel Judge. In an earlier ruling, the bankruptcy court held that certain insurance proceeds were not property of a chapter 7 estate converted from chapter 11, because the policy had been purchased post-confirmation by the reorganized debtor. The court thereupon entered an order authorizing the release of the interpleaded funds, stating that it had no jurisdiction over the monies. Prior to these rulings, an involuntary petition had been filed against the reorganized debtor but dismissed by the court. After the funds' release and subsequent transfer by the reorganized debtor, the dismissal of the involuntary was reversed on appeal and an order for relief was entered. When the trustee in the case of the reorganized debtor sought to recover the transferred funds based on several grounds for relief, the court, this time speaking through a different judge, held that recovery on all grounds was precluded by the previous order releasing the funds. As to the specific claims for avoidance of the transfers under 11 U.S.C. §§ 547 and 548, along with state fraudulent and preferential transfer claims brought pursuant to 11 U.S.C. § 544, the court concluded that recovery was not available under any of these provisions as a matter of law because the transfers occurred post-petition. The court made a similar ruling with respect to recovery of excessive legal fees under 11 U.S.C. § 329, while also concluding that it would be unfair to the recipient to subject it to the requirements of the statute.

## I. ISSUES ON APPEAL

1. Did the order authorizing the release of funds in the converted bankruptcy case preclude the court from exercising jurisdiction over the funds in the subsequent bankruptcy case by the reorganized debtor?

2. Is recovery of the excessive legal fees under 11 U.S.C. § 329 precluded because the payments to the attorney took place post-petition or because of equitable concerns?

3. Is recovery of the funds under 11 U.S.C. §§ 544, 547 and 548 barred because the transfers occurred post-petition?

2

## II.  JURISDICTION AND STANDARD OF REVIEW

The Bankruptcy Appellate Panel ("BAP") of the Sixth Circuit has jurisdiction to decide this appeal. The United States District Court for the Southern District of Ohio has authorized appeals to this Panel and a final order of the bankruptcy court may be appealed as of right pursuant to 28 U.S.C. § 158(a)(1).  For purposes of appeal, a final order "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 798, 109 S. Ct. 1494, 1497 (1989) (citations omitted).  The bankruptcy court's order granting summary judgment and dismissing the adversary proceeding is a final, appealable order. *See Treinish v. Norwest Bank Minn., N.A.* (*In re Periandri*), 266 B.R. 651, 653 (B.A.P. 6th Cir. 2001).

The bankruptcy court's dismissal in this matter turned on a conclusion of law, the preclusive effect of a court order.  Conclusions of law are reviewed de novo.  *In re John Richards Home Bldg. Co.*, 439 F.3d 248, 254 (6th Cir. 2006); *In re Downs*, 103 F.3d 472, 476-77 (6th Cir. 1996).  "De novo means that the appellate court determines the law independently of the trial court's determination." *In re Periandri*, 266 B.R. at 653.

## III.  FACTS

Troutman Enterprises, Inc. ("TEI") filed for bankruptcy relief under chapter 11 on April 23, 1992.  Several years prior to its bankruptcy filing, TEI purchased, and was the beneficiary under, a $500,000 life insurance policy on Larry Troutman, a shareholder and officer of TEI ("First Policy").  The existence of the First Policy was not disclosed in TEI's bankruptcy schedules or in its plan of reorganization confirmed on September 1, 1993.

Approximately 17 months after its plan was confirmed, TEI purchased on January 30, 1995, a $1 million life insurance policy on Roger Troutman, also a shareholder and officer of TEI ("Second Policy").  As with respect to the First Policy, TEI was both the owner and named beneficiary of the Second Policy.

On January 4, 1996, TEI's chapter 11 case was converted to chapter 7. On April 25, 1999, Larry Troutman and Roger Troutman died, apparently the result of a murder/suicide. Shortly thereafter, TEI amended its Schedule B to disclose for the first time in the bankruptcy records its interests in the First and Second Policies. Following the disclosure, Donald F. Harker, the chapter 7 trustee in TEI's bankruptcy case, brought an adversary proceeding against the insurer for the turnover of all insurance proceeds under both policies ("Harker Adversary"). Pursuant to court order, the insurance company interpleaded the proceeds of the policies to Firstar Bank pending resolution of the dispute. Subsequently, the shareholders of TEI intervened in the litigation as third-party defendants, asserting that they, rather than the chapter 7 estate, were entitled to the proceeds of the policies.

In a memorandum opinion entered January 24, 2000, the bankruptcy court, speaking through Judge Thomas F. Waldron, granted the trustee's complaint for turnover of the First Policy but denied the complaint for turnover of the Second Policy. *Harker v. Troutman* (*In re Troutman Enters. Inc.*), 244 B.R. 761 (Bankr. S.D. Ohio 2000). The bankruptcy court held that the First Policy was property of the converted bankruptcy estate because it was acquired prepetition by the debtor and the debtor's failure to disclose the existence of the policy prevented it from vesting in the reorganized debtor upon plan confirmation.[1] The bankruptcy court held that the Second Policy was property of the reorganized debtor, which did not come into the converted bankruptcy estate. The court reasoned that in the case of a confirmed chapter 11 converted to chapter 7, property of the converted estate did not include property acquired postconfirmation by a reorganized debtor because a reorganized debtor is a separate legal entity that holds its assets separate and apart from that of the original chapter 11 estate. *Id.* at 766-68.

---

[1] The bankruptcy court's decision that the proceeds of the First Policy belonged to TEI's chapter 7 estate rather than TEI's shareholders was appealed. Although the Bankruptcy Appellate Panel reversed the bankruptcy court, *Harker v. Troutman* (*In re Troutman Enters. Inc.*)*,* 253 B.R. 1 (B.A.P. 6th Cir. 2000), the Sixth Circuit Court of Appeals vacated the BAP decision and affirmed the bankruptcy court. *Harker v. Troutman* (*In re Troutman Enters. Inc.*), 286 F.3d 359 (6th Cir. 2002).

While the Harker Adversary was pending but prior to its resolution by the bankruptcy court, four creditors of TEI filed on October 18, 1999, an involuntary chapter 7 petition against TEI, the reorganized debtor ("Reorganized TEI"). Thereafter, on January 24, 2000, the same day as the bankruptcy court entered its memorandum and order in the Harker Adversary, the bankruptcy court entered a memorandum opinion and order dismissing the involuntary petition, concluding that the petitioning creditors did not have claims against Reorganized TEI because all of their claims were preconfirmation claims provided for in the confirmed plan. *In re Troutman Enters., Inc. (II)*, 244 B.R. 106 (Bankr. S.D. Ohio 2000). This decision was appealed by one of the petitioning creditors, National City Bank.

After filing the appeal, National City Bank requested that the bankruptcy court stay its dismissal of the involuntary petition pending the appeal and that the court enter an order prohibiting Reorganized TEI from disposing of its property during the pendency of the appeal. The bankruptcy court denied both requests. In the Harker Adversary, the defendant shareholders of TEI filed a motion asking that the insurance proceeds from the Second Policy, which had been interpleaded and were being held by Firstar Bank, be released in accordance with the court's previous ruling that the proceeds belonged to the Reorganized TEI as opposed to the converted bankruptcy estate of debtor TEI. In an order entered March 10, 2000, the court granted the motion. The one paragraph order entitled "Order Authorizing Distribution of Proceeds of Policy No. N990054700 (Roger Troutman)" ("Distribution Order") provided the following in its entirety:

> In accordance with the court's oral decision and the court's prior Order Granting In Part and Denying In Part Trustee's Complaint For Turnover And Authorizing Distribution Of Funds (Doc. 24-1), the Defendants' Motion For Entry Of Order Enforcing Agreed Order Granting Motion For Interpleader (Doc. 25-1) is **GRANTED** as to the proceeds of Policy No. N990054700 (Roger Troutman) delivered to Firstar Bank from Nationwide Insurance Company. The court has determined these funds are not property of any bankruptcy estate presently within the jurisdiction of this court, and the court intends to neither assert nor accept any further jurisdiction over these funds. Accordingly, Firstar Bank may distribute these funds plus any interest earned thereon in accordance with applicable nonbankruptcy law.

Subsequently, on September 26, 2000, the Bankruptcy Appellate Panel reversed the bankruptcy court's decision dismissing the involuntary petition against Reorganized TEI. *In re*

*Troutman Enters. Inc. (II)*, 253 B.R. 8 (B.A.P. 6th Cir. 2000). The BAP concluded that the reorganized debtor was liable to the petitioning creditors for the contractual obligations imposed by the confirmed plan and that, therefore, the petitioning creditors had standing to file an involuntary petition against Reorganized TEI in order to enforce these obligations, notwithstanding its existence as a separate legal entity. *Id*. at 13. Upon remand, the bankruptcy court on March 27, 2001, entered an order for relief under chapter 7 against Reorganized TEI, *nunc pro tunc* to October 18, 1999, the date the involuntary petition was filed. John Paul Rieser was duly appointed as chapter 7 trustee ("Trustee").

On May 14, 2002, the Trustee commenced the instant adversary proceeding ("Reiser Adversary"), seeking to recover for the benefit of Reorganized TEI's estate the majority of the proceeds from the Second Policy that the Trustee alleged were improperly transferred. According to the complaint, after entry of the Distribution Order in the Harker Adversary, Firstar Bank distributed sums in excess of $670,000[2] to Reorganized TEI in three checks,[3] which were then deposited in the IOLTA account of the Appellee law firm, Dinsmore & Shohl LLP ("Dinsmore"). The Trustee alleged that from that account, the funds were transferred to parties other than the creditors of Reorganized TEI, more particularly, to the shareholders of Reorganized TEI and other entities to whom the shareholders directed payment, including Dinsmore which received in excess of $100,000. The defendants in the Rieser Adversary are the various recipients of the payments,[4] with the Trustee asserting that the payments are avoidable and recoverable under various claims, including turnover under 11 U.S.C. § 542, unauthorized postpetition transfers under 11 U.S.C. § 549,

---

[2] At the time of the Distribution Order, the proceeds from the Second Policy held by Firstar Bank with interest totaled $1,044,547.95. Pursuant to court order, $381,818.20 of this total was paid to the Internal Revenue Service for Reorganized TEI's tax liabilities. The trustee's avoidance action does not seek to recover this transfer.

[3] According to the complaint, two checks dated March 21, 2000, were in the amount of $360, 222.73 and $26,801.87. A third check dated June 12, 2000 was in the amount of $271,926.59.

[4] One of the payments was to House of Wheat Funeral Home, Inc. The Trustee queried why the debtor, an Ohio Corporation in the music recording and real estate development businesses, would be paying a funeral home.

fraudulent transfers under 11 U.S.C. § 548, preferential transfers under 11 U.S.C. § 547, fraudulent conveyances and preferential transfers under Ohio state law pursuable under 11 U.S.C. § 544, theft and conversion under state law, and excessive legal fees under 11 U.S.C. § 329.

Several of the defendants responded with motions for summary judgment that raised numerous contentions as to why recovery of the transfers was precluded. The primary basis of the summary judgment motions was the legal effect and finality of the Distribution Order. The moving defendants observed that the bankruptcy court had stated in the order that the insurance proceeds from the Second Policy were not property of any estate within its jurisdiction, that the court did not intend to assert any jurisdiction over the proceeds, and that Firstar Bank was directed to distribute the proceeds. They also noted that there was no appeal from that order and argued that, therefore, it was final and binding on all parties.

After oral argument by counsel at a hearing on May 16, 2005,[5] the bankruptcy court, speaking through Bankruptcy Judge John E. Hoffman Jr. who had been assigned the adversary proceeding, announced that he would grant the summary judgment motions due to the finality of the Distribution Order. The Trustee filed a notice of appeal on June 22, 2005, and subsequently on September 9, 2005, the bankruptcy court entered an order and memorandum opinion setting forth detailed findings of fact and conclusions of law. In that memorandum, the bankruptcy court emphasized the finality of the Distribution Order, concluded that the BAP's reversal of the bankruptcy court's dismissal of the involuntary action against Reorganized TEI had no effect on the Distribution Order, and characterized the Rieser Adversary as an improper attempt to indirectly nullify or thwart the Distribution Order. The bankruptcy court observed that in bringing the Rieser Adversary, the Trustee was acting on behalf of the estate's creditors, which included, among others, the petitioning creditors who had not appealed or sought a stay of the Distribution Order. The bankruptcy court concluded that "it would simply be impractical, imprudent and inequitable to nullify the Distribution Order by ordering the avoidance and recovery of the Transfers when the parties justifiably relied on a final court order (the Distribution Order) that was not stayed or appealed."

---

[5] On November 18, 2002, the bankruptcy court entered an order staying the Rieser Adversary pending the distribution of funds in TEI's bankruptcy case. The stay was lifted on June 21, 2004.

7

In addition, the bankruptcy court concluded that the Trustee's turnover action under § 542 of the Bankruptcy Code must fail because this section pertains to turnover of property of the estate and Judge Waldron had concluded in the Distribution Order that the proceeds of the Second Policy were not property of Reorganized TEI's bankruptcy estate at the time they were disbursed. The court also held that the Trustee's theft and conversion count failed because the Distribution Order relinquished the court's jurisdiction over the proceeds and authorized the transfers. Similarly, the court concluded that the Trustee's claim under § 549 of the Bankruptcy Code, which permits the avoidance and recovery of unauthorized postpetition transfers, must be rejected because there were no transfers of property of the estate and because the transfers were authorized by the court. As to the Trustee's claims under §§ 544, 547, and 548 of the Bankruptcy Code and under Ohio fraudulent conveyance and preferential transfer law, the court held that all fail because the transfers took place postpetition, due to the court's *nunc pro tunc* order which made the order for relief effective October 18, 1999, and these statutory provisions only permit the recovery of certain prepetition transfers.

Finally, as to the Trustee's claim pursuant to 11 U.S.C. § 329 to recover excessive legal fees paid to Dinsmore, the bankruptcy court concluded that § 329 provided no avenue for recovery because the statute pertained only to attorney fees paid within the year prior to the filing of the petition and the payments to Dinsmore took place postpetition due to the *nunc pro tunc* order. The bankruptcy court also reasoned that it would be unfair to subject Dinsmore to the requirements of either § 329 or § 330 of the Bankruptcy Code because at the time its services were rendered, Judge Waldron had made a judicial determination that neither Reorganized TEI nor the proceeds of the Second Policy were subject to the jurisdiction of the bankruptcy court. Accordingly, the court held that Trustee's § 329 claim for the recovery of attorney fees failed as a matter of law.[6]

---

[6] All of the forgoing causes of action were set forth in the Trustee's first eight claims in the Reiser Adversary. In counts nine through eleven, the Trustee sought relief that could have been awarded only if he were successful on one of his underlying claims. More specifically, in count nine, the Trustee sought to bar the defendants from filing proof of claims due to their receipt of the allegedly invalid payments; in count ten, the Trustee sought an accounting, imposition or declaration of a trust with regard to the payments, and disgorgement of payments; and in count eleven, the
(continued...)

The Trustee then filed a second notice of appeal on September 14, 2005, timely appealing the bankruptcy court's written ruling.

## IV.  DISCUSSION

A. <u>Legal Effect of the Distribution Order</u>.

There is no dispute that the Distribution Order was a valid, final order, not appealed or stayed.  Nor is there a dispute as to the general principles of finality and the binding effect of a final order.  However, the appropriate question in this case is not whether the Distribution Order was final, but what was the ruling of the bankruptcy court in the Distribution Order, with full consideration to the context in which the Order was entered.  It must be remembered that the Harker Adversary out of which the Distribution Order arose was a turnover action by the chapter 7 trustee in Troutman I (TEI's bankruptcy case will be referred to as "Troutman I" and Reorganized TEI's case, "Troutman II"), wherein the trustee sought recovery of the Second Policy proceeds, that these proceeds had been interpleaded, and that the court had subsequently concluded that the turnover should be denied because the Second Policy had been purchased postconfirmation and thus belonged to Reorganized TEI rather than TEI.  In light of the court's ruling and the fact that the funds had been interpleaded, the defendants in that action filed a motion asking for release of the funds.  The Distribution Order granted that motion.

Admittedly, there had been an involuntary petition filed against Reorganized TEI, whom the court had determined to be the rightful owner of the Second Policy proceeds, but the court had dismissed that petition by the time the Harker defendants filed the motion to release the Second Policy proceeds.  Thus, it was appropriate for the court order to release the funds because their owner, Reorganized TEI, a separate legal entity from TEI, was not in bankruptcy at that time.  And, although the dismissal of the involuntary petition was on appeal, the court had denied a request that

---

[6](...continued)
Trustee sought recovery of costs and attorney fees.  Due to the bankruptcy court's dismissal of the underlying substantive claims, the court rejected the remaining claims as a matter of law.

9

the dismissal be stayed pending the appeal. As such, there was no bankruptcy case pending against Reorganized TEI at the time the request was made that its property be released.

Furthermore, it must be emphasized that the motion for release of the funds was not filed in Troutman II, but in the Harker Adversary that was pending in Troutman I. The court having previously concluded in its January 24, 2000 memorandum filed in the Harker Adversary that these funds were not property of the Troutman I estate and therefore not subject to turnover to Troutman I's trustee, it was appropriate for the court to then release these funds because it had "determined these funds are not property of any bankruptcy estate presently within the jurisdiction of this court . . . ." In other words, because the funds did not belong to TEI, the debtor in Troutman I, the bankruptcy case in which the trustee had filed the turnover action and the only bankruptcy case within the jurisdiction of the court at the time, the court was saying that it had no jurisdiction over the funds. Clearly, the court was correct. *See Gardner v. United States* (*In re Gardner*), 913 F.2d 1515, 1518-19 (10th Cir. 1990) (once bankruptcy court determines estate has no interest in property, court lacks jurisdiction to then determine other interests in the property). Similarly, the court's next statement in the Distribution Order that it "intends to neither assert nor accept any further jurisdiction over these funds" was an appropriate follow-up to the lack of jurisdiction statement: because it had no jurisdiction over non-Troutman I funds, the court did not intend to assert jurisdiction over the funds.

Having determined that the Troutman I trustee was not entitled to the funds because they were not property of the debtor TEI, the court's role in the matter would have been over at that point but for the fact that the funds had been interpleaded and were being held pending the conclusion of the Harker Adversary. In releasing the funds, the court was simply reaffirming its prior determination that the Second Policy was not an asset of the Troutman I estate and that consequently, the trustee had no right to assert control over the proceeds. In this regard, it should be noted that the court did not direct Firstar Bank to whom the funds should be distributed, nor for that matter, did the court even order the release of the funds. Instead, the order states: "Firstar Bank *may* distribute these funds plus any interest earned thereon in accordance with applicable nonbankruptcy law." [Emphasis supplied.] The court's chosen language was an additional recognition of its lack of

10

jurisdiction over the funds and over any determination as to whom they should be distributed. The court was saying, in effect, that its control over the funds had concluded and that, therefore, whatever constraints were on the funds as a result of the Harker Adversary were being removed, giving Firstar Bank the freedom to dispose of the funds, with any disposition to be governed by the obvious "applicable nonbankruptcy law" since bankruptcy law did not apply.

Contrary to the Appellee Dinsmore's argument, the Distribution Order was not a finding that the Second Policy proceeds were not property of Reorganized TEI or of the Troutman II estate. In fact, the bankruptcy court had previously denied the turnover request in the Harker Adversary in Troutman I precisely because the funds belonged to Reorganized TEI, rather than to TEI or its estate. There is simply no basis for the assertion that the Distribution Order was a determination as to what constituted property of the Troutman II estate because that case was not pending at the time of the ruling and the motion was not even filed in that case.[7]

The Distribution Order was not a ruling that the court would never assert jurisdiction over the Second Policy proceeds. The court was simply saying that it did not intend to assert jurisdiction over the funds in the Troutman I case since they did not belong to that estate. To hold otherwise would mean that the court would have had no jurisdiction over the funds even if Reorganized TEI had subsequently decided to file a voluntary bankruptcy case, a result that would be illogical. And, contrary to the bankruptcy court's conclusion, the Rieser Adversary was not a collateral attack on the final Distribution Order. Permitting the Rieser Adversary to go forward in no way reverses or disturbs the Distribution Order or the court's conclusion at the time the order was entered that it had no jurisdiction and did not intend to assert jurisdiction over the Second Policy proceeds in the Troutman I case.

---

[7] The record does indicate that the Distribution Order was inexplicably cross-docketed in Troutman II in addition to the docket in the Harker Adversary. The Trustee notes that because electronic filing and noticing had not yet commenced when the Distribution Order was cross-docketed, no party in Troutman II would have received electronic notice of the order. As such, we attach no legal significance to what, in effect, was merely a clerical step.

11

Permitting the Rieser Adversary to proceed does not thwart the court's statement in the Distribution Order that the court did not intend to assert jurisdiction over the funds because they did not belong to a debtor before the court. Our conclusion in this regard is not altered by the fact that the bankruptcy court entered the order for relief in Troutman II *nunc pro tunc* to a date before the Distribution Order was entered. At the time the Distribution Order was entered, only TEI was in bankruptcy. Thus the court was correct at that point that the property did not belong to a debtor before the court. The *nunc pro tunc* order for relief in Troutman II did not retroactively alter the facts as they existed at the time the court entered the Distribution Order. *See Transamerica Ins. Co. v. South*, 975 F.2d 321, 325 (7th Cir. 1992) (quoting *King v. Ionization Int'l, Inc*. 825 F.2d 1180, 1188 (7th Cir. 1987) ("The office of a *nunc pro tunc* ('now for then') order is to clean up the records showing what was previously done with effect from the time done; it is not to alter substantive rights.")); *In re Harbaugh*, 99 B.R. 671, 674 (Bankr. W.D. Pa. 1989), *rev'd on other grounds*, No. 89-1540, 1989 WL 139254 (W.D. Pa. Oct. 13, 1989) (*nunc pro tunc* order is not an alteration of substantive rights). Accordingly, the bankruptcy court's conclusion that the finality of the Distribution Order compels the dismissal of the Rieser Adversary in its entirety is erroneous.[8]

---

[8] As previously explained, it is our interpretation that nothing in the Distribution Order bars or precludes the Rieser Adversary. Thus, it is not necessary for us to address the standing issues raised by the parties, i.e., whether Appellee Dinsmore and the other defendants could have and should have relied on the Distribution Order, and whether the Trustee was precluded from challenging the Distribution Order by means of the Rieser Adversary because the Troutman II petitioning creditors did not appeal the Distribution Order. Nonetheless, a few remarks as to these issues seem appropriate.

One of the bankruptcy court's conclusions was that it would be inequitable for the Reiser Adversary to go forward because Dinsmore and the other defendants reasonably relied on the Distribution Order. The Trustee correctly observes in this appeal that there was no evidence before the court indicating that any of the defendants other than Dinsmore even knew about the Distribution Order at the time of their receipt of the payments. As to Dinsmore, we find it highly unlikely it actually relied on the Distribution Order in accepting payment, notwithstanding its claim of reliance. The Distribution Order did not direct or even mention payment to Dinsmore and the other defendants. The Distribution Order was entered in the Harker Adversary in the Troutman I bankruptcy case rather than in the Troutman II case, and payment to Dinsmore and the other defendants was not an issue before the court in the Harker Adversary or Troutman I. Furthermore, there is no indication that creditors or parties in interest of Troutman II were even given notice of the Distribution Order.

(continued...)

12

For the foregoing reasons, the bankruptcy court's dismissal of the Trustee's claims based on §§ 542 and 549 of the Bankruptcy Code and state law claims of theft and conversion must be reversed because they were all predicated on the erroneous conclusion that the Distribution Order

[8](...continued)

Additionally, we see nothing in the record which would indicate that Dinsmore was entitled to rely on the Distribution Order, even assuming, *arguendo*, that the order set forth a proper basis for reliance. There is no indication in the record that Dinsmore and the other defendants were parties in the Harker Adversary or even creditors of TEI or Reorganized TEI, and Dinsmore concedes as much in its brief. Nonetheless, Dinsmore argues in its brief that reliance on bankruptcy court orders extends beyond the parties, citing, as an example, good faith purchasers who rely on orders authorizing sales under § 363 of the Bankruptcy Code. *See Weingarten Nostat, Inc. v. Serv. Merchandise Co.*, 396 F.3d 737, 741 (6th Cir. 2005) ("Section 363(m) reflects the salutary policy of affording finality to judgments approving sales in bankruptcy by protecting good faith purchasers, [and] the innocent third parties who rely on the finality of bankruptcy judgments in making their offers and bids . . . ."). However, reliance in that context is expressly established by § 363(m) of the Bankruptcy Code and does not apply herein because the Distribution Order did not involve a sale or lease. The general standard for reliance is established by the principles of res judicata or claim preclusion whereby a final decision on the merits by a court of competent jurisdiction precludes a second action if the second action involves the same parties or their privies, the second action raises an issue actually litigated or which should have been litigated in the first action, and an identity of the causes of action. *See Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.,* 973 F.2d 474, 480 (6th Cir. 1992) (recognizing that party in the bankruptcy context may include creditors and equity security holders). "Privity in this sense means a successor in interest to the party, one who controlled the earlier action, or one whose interests were adequately represented." *Id*. at 481. Absent a finding that the defendants were parties or in privity with parties to the Distribution Order, they were neither legally bound nor legally entitled to rely on its finality.

As to the bankruptcy court's conclusion that the Trustee was precluded from challenging the Distribution Order by means of the Rieser Adversary because he was representing Troutman II creditors in bringing the adversary and because some of the Troutman II creditors, namely the petitioning creditors, had failed to appeal the Distribution Order, we must disagree. Regardless of whether these creditors would be bound by the Distribution Order, a bankruptcy trustee is not merely a successor in interest to particular creditors of the estate. *See Williams v. Marlar* (*In re Marlar*), 252 B.R. 743, 758 (B.A.P. 8th Cir. 2000) (stating that "trustee is not merely . . . a representative of a single creditor," panel held that chapter 7 trustee suing to set aside fraudulent conveyance under state law was not in privity with debtor's ex-wife who had unsuccessfully sought to challenge transfer on same grounds); *cf. Stevenson v. J.C. Bradford & Co.* (*In re Cannon*), 277 F.3d 838, 853 (6th Cir. 2002) ("If a cause of action belongs solely to the estate's creditors, . . . the trustee has no standing to pursue the claim."). Accordingly, the Trustee was not bound by the court's earlier ruling. *See United States v. Chicago*, 870 F.2d 1256, 1262 (7th Cir. 1989) ("An attack by a nonparty is not collateral; the nonparty did not have his day in court.").

set forth a finding that the proceeds were not property of the Troutman II bankruptcy estate. And, as previously noted, the bankruptcy court held that the Trustee's § 549 action could not be maintained because one of the elements of avoidance under this provision is that the transfer must not have been authorized by the court or the Bankruptcy Code. According to the court, the Distribution Order authorized the distribution of funds. However, as previously noted, the Distribution Order only permitted the release of the funds rather than a specific authorization of transfer to the defendants. As such, the court's conclusion in this regard is erroneous as a matter of law.

B. Trustee's claims under 11 U.S.C. § 329.

Section 329 of the Bankruptcy Code, entitled "Debtor's transactions with attorneys," provides as follows:

> (a) Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

> (b) If such compensation exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive, to–
>    (1) the estate, if the property transferred–
>        (A) would have been property of the estate; or
>        (B) was to be paid by or on behalf of the debtor under a plan under chapter 11, 12, or 13 of this title; or
>    (2) the entity that made such payment.

In the instant proceeding, the Trustee sought recovery of the funds transferred to law firm Dinsmore on the basis that "such compensation exceed[ed] the reasonable value" of the services provided within the meaning of § 329(b). The bankruptcy court's dismissal of this claim was premised on the conclusion that the claim failed as a matter of law because the transfers took place post-petition rather than during the one-year period prior to the petition date as encompassed by § 329. The court also concluded that:

> [I]t would be unfair to subject Dinsmore to the requirements of either § 329 or § 330 of the Code given the procedural history of the *Troutman I* and *Troutman II* bankruptcy cases. At the time Dinsmore rendered legal services to Reorganized TEI,

14

a judicial determination had been made by Chief Judge Waldron that neither Reorganized TEI nor the proceeds of the second policy were subject to the jurisdiction of the bankruptcy court. By now asserting that the *nunc pro tunc* entry of the Order for Relief retroactively subjected Dinsmore to the Code's requirements governing retention and compensation of professionals, the Trustee is again attempting to rewrite history.

As to the former contention regarding the post-petition nature of the payments, this Panel must disagree with the bankruptcy court's conclusion. Section 329 not only addresses payments within the one year prior to the bankruptcy filing but also agreements for attorney fees made during the one year preceding the bankruptcy filing, as well as payments of, or agreements for, attorney fees after the petition is filed. Additionally, Rule 2017(b) of the Federal Rules of Bankruptcy Procedure subjects to court review any payments, or any agreements to pay by a debtor to an attorney, made after entry of the order for relief "for services in any way related to the case." 3 Alan N. Resnick, *et al.*, *Collier on Bankruptcy* ¶ 329.03[1][c] (15th ed. rev. 2005) (citing Fed. R. Bankr. P. 2017(b)). Moreover, it has been held that fees received by a debtor's attorney during the gap period between the filing of an involuntary petition and the entry of an order for relief are subject to judicial review for reasonableness under § 329, even though an order approving the employment of counsel is not required at the time. *See In re McNar, Inc.*, 116 B.R. 746, 750 (Bankr. S.D. Cal. 1990). Finally, the "court has jurisdiction to reexamine the reasonableness of the amounts paid and to enter an order of disgorgement whether or not the money paid was for legal services or was merely an unauthorized payment . . . post-petition." *In re Austin*, 352 B.R. 529, 531-32 (Bankr. M.D. Fla. 2006). *See also Dery v. Cumberland Casualty & Surety Co.* (*In re 5900 Assocs., Inc.*), 468 F.3d 326, 330 (6th Cir. 2006) ("The Bankruptcy Code assigns to courts a comprehensive duty to review fees in a particular case."); *Matter of Schroeder*, 120 B.R. 527, 529 (Bankr. D. Neb. 1990) ("[I]t is contrary to Bankruptcy Code § 330 and Bankruptcy Rules 2016 and 2017 for an attorney to receive a post-petition payment from the debtor without leave of court. If an attorney receives a post-petition payment without leave of court, the funds may be disgorged and disallowed."). Accordingly, the bankruptcy court's conclusion that a review under § 329 of the fees paid to Dinsmore is precluded because the payments took place post-petition must be reversed.

15

With respect to the bankruptcy court's conclusion that it would be unfair to subject Dinsmore to the requirements of the Bankruptcy Code given the procedural history of the case, it must be noted that the bankruptcy court made this equitable ruling in the context of granting a motion for summary judgment. Given the Panel's conclusions regarding the legal effect of the Distribution Order and the otherwise lack of a factual record to adjudge the relative equities of the parties, the bankruptcy court's conclusion that it would be "unfair" as a matter of law to subject the transfers to the requirements of §§ 329 and 330 of the Bankruptcy Code must also be reversed.

C. <u>Trustee's claims under 11 U.S.C. §§ 547, 548 and 544</u>.

Although the Trustee did not challenge the bankruptcy court's specific findings and conclusions regarding his claims brought under §§ 547, 548 and 544,[9] the Appellee Dinsmore relied on those findings and conclusions as additional support for its argument that the bankruptcy court's dismissal of those claims should be affirmed. Those specific findings and conclusions present alternative reasons for the bankruptcy court's holdings. For the following reasons, based on the bankruptcy court's alternative findings and conclusions, the Panel affirms the bankruptcy court's dismissal of the claims brought under §§ 547, 548 and 544.

Preferential transfers may be avoided under § 547 only if made "on or within 90 days before the date of the filing of the petition" or "between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider." 11 U.S.C. § 547(b)(4). And fraudulent transfers may be avoided under § 548 if made "within one year before the date of the filing of the petition."[10] 11 U.S.C. § 548(a). The bankruptcy court found that because

---

[9] The Trustee's § 544 claims invoke the avoidance powers granted under that section and allege fraudulent transfers under Ohio Revised Code Annotated Chapter 1336 and § 1313.56. Although the Trustee did not include the bankruptcy court's specific findings and conclusions as to § 544 in his statement of issues to be presented on appeal, he challenges the court's conclusions in his appellate brief.

[10] Section 548(a)(1) was amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") and now provides for a two-year look-back period. The amended version, however, does not apply to this case. Although the amendment to § 548 was effective on April 20, 2005, in contrast to the October 17, 2005, effective date for most of the

(continued...)

the challenged transfers were made postpetition, they could not be avoided as preferences under § 547 or as fraudulent transfers under § 548.

It is undisputed that the challenged transfers in this case were made after the Distribution Order was entered on March 10, 2000, and, thus, after the petitioning creditors filed the involuntary petition in this case on October 18, 1999. The triggering date for computation of the preference period under § 547 and for avoidance of fraudulent transfers under § 548 is the date of the filing of the petition, not the date of entry of an order for relief. *Emerson v. Maples* (*In re Mark Benskin & Co.*), 161 B.R. 644, 650-51 (Bankr. W.D. Tenn. 1993); *Official Unsecured Creditors' Comm. v. Louisiana-Pacific Corp.* (*In re Workmans Forest Prods., Inc.*), 82 B.R. 551, 552 (Bankr. D. Or. 1988); *see* 11 U.S.C. § 101(42) (defining "petition" to include an involuntary petition filed under § 303). Thus, the bankruptcy court's dismissal of the §§ 547 and 548 claims are affirmed on this alternative basis.

The bankruptcy court also concluded, albeit without discussion, that the Trustee's fraudulent transfer claims brought under the avoidance powers granted in § 544 fail as a matter of law because § 544 applies only to prepetition transfers of property. Section 544(a) provides the trustee with "strong-arm" powers, giving him the right to "avoid any transfer of property of the debtor" that is voidable by certain hypothetical creditors "as of the commencement of the case." 11 U.S.C. § 544(a); S. Rep. No. 95-989, at 85 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5871. And § 544(b) gives the trustee the rights of actual unsecured creditors under applicable law to avoid transfers of "an interest of the debtor in property." 11 U.S.C. § 544(b)(1). A clear majority of courts have interpreted the language in § 544 as applying only to prepetition transfers of property. *See, e.g., Farmer v. Autorics, Inc.* (*In re Branam*), 247 B.R. 440, 444 (Bankr. E.D. Tenn. 2000) (citing cases and explaining that "the phrase 'property of the debtor' in § 544 is not interchangeable with 'property of the estate' in § 549); *Moratzka v. Clark* (*In re Metro. Cosmetic Reconstructive*

_____

[10](...continued)
BAPCPA amendments, this case was filed before April 20, 2005. *See* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, § 1501(b)(1), 119 Stat. 23, 216 (stating that, unless otherwise provided, the amendments do not apply to cases commenced under title 11 before the effective date of BAPCPA).

17

*Surgery P.A.*), 125 B.R. 556, 557 (Bankr. D. Minn. 1991) (finding that § 544(b) applies only to prepetition transfer of interest in property of debtor and not to postpetition transfer of interest in property of estate); *In re Schneiderman*, 251 B.R. 757, 763 (Bankr. D.C. 2000) (same). *But see Murray v. Guillot* (*In re Guillot*), 250 B.R. 570, 601-02 (Bankr. M.D. La. 2000) (stating "[w]e differ from the courts who relegate § 544(a) to pre-petition transfers, because, we think, § 549 simply does not work to give the trustee any relief in this proceeding").

In addition to § 544 being expressly applicable to transfers of "property of the debtor" rather than "property of the estate," the statute of limitations provision in § 546 provides additional support for applying § 544 to prepetition transfers only. As one court persuasively reasoned:

> Statutes cannot be read intelligently if the eye is closed to considerations evidenced in affiliated statutes.
>
> When Congress enacted the Bankruptcy Reform Act of 1978, it provided the trustee with an arsenal of weapons designed to permit him to recover for the estate certain property transferred in fraud of creditors, 11 U.S.C. §§ 544 and 548, or which tended to prefer one creditor over others, 11 U.S.C. §§ 544, 545, 547 and 553. All of these avoiding powers, including that conferred by section 544(b), are circumscribed by the same statute of limitations, 11 U.S.C. § 546, that is, the earlier of two years after the appointment of a trustee or the time the case is closed or dismissed.[11] In addition, Congress conferred upon the trustee by virtue of 11 U.S.C. § 549 the ability to avoid unauthorized post-petition transfers. Significantly, the avoidance of such transfers is governed by a separate statute of limitations keyed not to the appointment of the trustee but to the date of the transfer. 11 U.S.C. § 549(d).
>
> Were section 544(b) meant to apply to post-petition transfers, it would have made little sense to limit the trustee to recovering those transfers, avoidable under

_____

[11] Section 546(a) was amended in 1994 to its current version, which provides that avoidance actions "may not be commenced after the earlier of—
(1) the later of—
    (A) 2 years after the entry of the order for relief; or
    (B) 1 year after the appointment or election of the first trustee under section 702, 1104, 1163, 1202, or 1302 of this title if such appointment or such election occurs before the expiration of the period specified in subparagraph (A); or
(2) the time the case is closed or dismissed."
11 U.S.C. § 546(a). The 1994 amendment does not, however, affect the reasoning set forth in the *Sattler* opinion.

non-bankruptcy law, which were made only within two years from the time of the trustee's appointment. A statute of limitations such as that contained in section 549 and linked to the making of the transfer would necessarily have been provided. Indeed, one leading commentator has described the section 546 statute of limitations as applying to only pre-petition transfers. 4 L. King, Collier on Bankruptcy, ¶ 549.03[4] at 549-15 (15th ed. 1986). And given the extraordinary breadth of section 549, we are compelled to conclude that transfers such as those which the Trustee seeks to avoid were intended to be embraced by section 549 and not by section 544.

*Eisenberg v. Bank of New York* (*In re Sattler's, Inc.*), 73 B.R. 780, 790 -791 (Bankr. S.D.N.Y. 1987) (citations omitted). Based upon the above reasoning, the bankruptcy court's dismissal of the Trustee's § 544 claims must be affirmed on the alternative basis that such claims apply only to prepetition transfers.

## V. CONCLUSION

In light of the foregoing, the bankruptcy court's decision dismissing the Trustee's claims under §§ 547, 548 and 544 is AFFIRMED, and its decision dismissing all remaining claims is REVERSED and the matter is REMANDED to allow the Trustee to pursue those claims.